**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2559-24

TERESA DUNNE, individually and
in her capacity as the Administrator
of the ESTATE OF LOUIS DOTO,
SR., ANN MARIE TRASATTI,
and LOUIS DOTO, JR.,

     Plaintiffs-Appellants,

v.

ADVANCED SUBACUTE
REHABILITATION SERVICES
AT SEWELL, LLC, ADVANCED
HEALTHCARE MANAGEMENT,
LLC, N. FRIED CORPORATION,
NATHAN FRIEDMAN, EDWARD
FRIEDMAN, and FAMILY OF
CARING, LLC,

     Defendants-Respondents.

_____

Argued March 17, 2026 – Decided August 14, 2026

Before Judges Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Docket No. L-0769-22.

Scott T. Taggart argued the cause for appellants (Spear, Greenfield, Richman, Weitz & Taggart, PC, attorneys; Marc Greenfield, on the brief).

Monica C. Fillmore argued the cause for respondents (Burns White LLC, attorneys; Monica C. Fillmore and Alana C. Khan, on the brief).

PER CURIAM

In this COVID-19-related wrongful death and survivor action, plaintiffs Teresa Dunne, individually and in her capacity as the Administrator of the Estate of Louis Doto, Sr., Ann Marie Trasatti, and Louis Doto, Jr. (Doto, Jr.) appeal from two Law Division orders: (1) the February 28, 2025 order granting summary judgment in favor of defendants Advanced Subacute Rehabilitation Center at Sewell, LLC (Advanced Subacute), Advanced Healthcare Management, LLC, N. Fried Corporation, Nathan Friedman, Edward Friedman, and Family of Caring, LLC, denying plaintiffs' cross-motion for summary judgment, and dismissing the third amended complaint with prejudice; and (2) the April 16, 2025 order denying their motion for reconsideration. We affirm.

I.

Beginning in 2015, Louis Doto, Sr. (Doto) was employed by defendant BP & SC Services, Inc. (BP). BP leased Doto to Advanced Subacute, a 139-bed skilled nursing and rehabilitation facility in Sewell. Advanced Subacute

controlled the details of Doto's work, paid his wages, and had the power to hire and discharge him. A BP employee was assigned to the facility to train and supervise Doto and other leased employees. BP was responsible for securing workers' compensation insurance coverage for Doto.

Advanced Subacute assigned Doto to work as an aide in the laundry department in the basement of the facility. No residents were housed in the basement. Doto used an entrance and exit directly into the basement exclusively used by laundry personnel. Clinical staff used a separate entrance and exit into a part of the facility where residents were located. Visitors entered and exited the facility through a separate reception area. Doto worked the overnight shift, from 11:00 p.m. to 7:00 a.m. He was in the community when he was not working at the facility.

Doto was assigned to wash, dry, and fold linens. All linens were sent to Doto in the basement through a dumbwaiter system. Doto performed his work entirely in the basement. Linens from rooms of residents with COVID-19 were delivered to Doto for laundering in clearly marked red bags. Doto had no contact with residents and did not deliver clean linens to resident rooms.

Sheila Smith worked as an aide in the laundry department with Doto. Smith visited resident rooms, including the rooms of residents with COVID-19,

A-2559-24

to deliver clean linens. It was undisputed Smith never contracted COVID-19 at the facility.

During the COVID-19 state of emergency, Advanced Subacute required everyone at the facility, including Doto, to wear a mask. The respiratory protection program, developed for and implemented at Advanced Subacute in June 2020, was in place during Doto's employment. The program required only high-risk employees – those with direct resident contact – to wear N-95 masks, along with other protective gear. High-risk employees included medical staff, such as physicians, nurses, and nursing aides, and occupational and physical therapists. Doto was not a high-risk employee. Because Doto was not required to wear an N-95 mask, he was not required to be fit tested for the mask and was instead required to wear a surgical mask. However, Advanced Subacute made N-95 masks available to all employees and contractors at the facility, including non-high-risk employees, if they elected to wear one. The record contains no evidence Doto elected to wear an N-95 mask.

Advanced Subacute required Doto to attend periodic mandatory training sessions with high-risk employees at the facility, including housekeepers and porters who entered resident rooms. The meetings took place in the dining room on the first floor of the facility, which housed residents. The dining room doors

A-2559-24

were closed to residents, social distancing was encouraged, and all employees were required to wear masks, although only high-risk employees were required to wear N-95 masks. The meetings were staggered by department to ensure space for social distancing. The last meeting Doto attended was in November 2020.

All visitors and workers in the facility were required daily to answer questions about COVID-19 symptoms and exposures, and to have their temperatures taken when they arrived at the facility. In addition, in December 2020, all employees and contractors were routinely tested for COVID-19. There were no reported cases of COVID-19 at the facility from June 2020 to October 2020.

On December 23, 2020, during a routine test at the facility, Doto tested positive for COVID-19. The last member of the housekeeping staff who Doto may have encountered during work who tested positive for COVID-19 did so twenty-two days earlier. Doto died from the disease on January 18, 2021.

After Doto's death, the Occupational Safety and Health Administration (OSHA) found two "serious" violations at the facility concerning the N-95 masks worn by housekeepers, who were considered high-risk employees. Both violations arose from Advanced Subacute's failure to fit test those employees.

5

Fit testing gauges the effectiveness of an N-95 mask on the wearer's face. The violations did not concern Doto, who was not considered a high-risk employee. Doto did, however, have contact with housekeeping staff who were not fit tested for the N-95 masks they wore.

In response to OSHA's findings, Advanced Subacute fit tested all non-clinical staff. It was determined all N-95 masks properly fit non-clinical staff. The New Jersey Department of Health and county health officials, both of which were aware of the precautions in place at the facility, did not cite Advanced Subacute for any violations.

Doto's estate filed a workers compensation claim petition with the Department of Labor and Workforce Development. Initially, the estate named both BP and Advanced Subacute as Doto's employer. Doto's estate received a workers' compensation award for his death.[1]

On July 28, 2022, plaintiffs filed a complaint in the Law Division. They thereafter filed several amended complaints, the final being the third amended complaint filed on August 13, 2024. The third amended complaint identified Dunne as the Administrator of Doto's estate and his daughter. Although Trasatti

---

[1] The record does not contain a copy of the workers compensation petition or award. We proceed on the assumption the claim was filed by Doto's estate.

and Doto, Jr. are named as plaintiffs, the third amended complaint did not identify their relationship to Doto. We surmise they are his heirs. The defendants are identified as the owners and operators of the Advanced Subacute facility, although specific allegations about their relationship to the facility are not provided.

Plaintiffs alleged defendants carelessly, negligently, recklessly, grossly negligently, or willfully and intentionally disregarded threats to Doto's health and safety by not exercising reasonable care to limit the transmission of COVID-19 at the facility. Plaintiffs alleged defendants' acts caused Doto to become infected with COVID-19, resulting in his death. They asserted wrongful death and survivor causes of action and sought compensatory and punitive damages.

On October 11, 2024, after discovery, defendants moved for summary judgment. They argued: (1) they were immune from plaintiffs' claims pursuant to N.J.S.A. 26:13-19(c)(2), a provision of the Emergency Health Powers Act, N.J.S.A. 26:13-1 to -36; (2) plaintiffs' claims were barred under N.J.S.A. 34:15-8, the exclusive remedy provision of the Workers Compensation Act (WCA), N.J.S.A. 34:15-1 to -146, because Doto's estate received a workers' compensation award arising from his death; (3) Doto cannot establish he was infected with COVID-19 at the facility; (4) plaintiffs' expert reports contain net

opinions on causation; and (5) the OSHA report is inadmissible because it contains hearsay opinions.

Plaintiffs opposed the motion and cross-moved for summary judgment. They argued: (1) defendants are not immune under N.J.S.A. 26:13-19 because Advanced Subacute engaged in acts of gross negligence or willful misconduct by not following proper precautions against COVID-19 infection, including not (a) fit testing some high-risk employees, (b) hiring an infection preventionist until October 2020, despite regulations requiring retention of such an expert at least as early as April 2020, and (c) considering Doto a high-risk employee because he had contact with high-risk staff and came into contact with laundry from COVID-19-positive residents; (2) their claims were not precluded by the workers' compensation bar because Doto was not an employee of Advanced Subacute; and (3) their expert reports did not contain net opinions as to causation.

On February 28, 2025, Judge Benjamin D. Morgan issued a comprehensive written decision granting defendants' motion and denying plaintiffs' cross-motion. The judge provided a concise summary of the law providing immunity to healthcare providers during the COVID-19 state of emergency:

In response to COVID-19, Governor Murphy issued Executive Order No. 112 ("Order") on April 1, 2020. This Order declared all health care professionals and facilities immune from civil liability while acting in response to the pandemic. The Order was later enacted into law, retroactive to March 9, 2020, into New Jersey's COVID-19 Immunity Statute ("Immunity Statute"), N.J.S.A. 26:13-1, et. seq. The Immunity Statute allows for civil immunity of healthcare facilities that were acting in response to COVID-19, if the actions of the private entity or individual do not rise to the level of "crime, actual fraud, actual malice, gross negligence or willful misconduct." N.J.S.A. 26:13-19(c)(2).

Judge Morgan recited the relevant provisions of N.J.S.A. 26:13-19(c)(2), noting "the bounds of civil immunity for private entities includes":

any act or omission in connection with a public health emergency, or preparatory activities, provided that the action of the person or entity is undertaken pursuant to the exercise of the authority provided pursuant to this act, including any order, rule or regulation adopted pursuant thereto. A person, entity or employee of the entity is not immune under this section, however, for an injury that results from an act that is outside the scope of the authority granted by this act or for conduct that constitutes a crime, actual fraud, actual malice, gross negligence or willful misconduct.

Quoting Mueller v. Kean University, 474 N.J. Super. 272, 287 (App. Div. 2022), the judge found "[a]ctions taken that relate to 'public health emergency preparedness and response action is to be liberally construed.'" (internal quotations omitted). Judge Morgan continued, "[b]ecause this statute is

9                                                                    A-2559-24

intended 'to protect the public health, safety and welfare, especially during emergencies,' actions of healthcare facilities are protected if they can be 'construed to accomplish the Legislature's purpose.'" (quoting Worthington v. Fauver, 88 N.J. 183, 194 (1982)).

Noting plaintiffs do not dispute Advanced Subacute is a healthcare provider protected by the Order and N.J.S.A. 26:13-19, the judge found

> there is no dispute . . . Advanced Subacute was acting in response to the COVID-19 pandemic and was required to keep residents in its facility that contracted COVID-19. The New Jersey Department of Health required long-term care facilit[ies] "to admit and readmit patients with COVID-19 once they no longer required hospital ICU[-]level care." The facility was open for the duration of the pandemic and provided care to many residents during that time, regardless of whether they tested positive for COVID-19. The Immunity Statute is intended to protect those facilities that are forced to work to combat public health emergencies when they are placed in the very difficult situation of caring for patients that may increase risk to other patients and staff.

Thus, the judge found, "[d]efendant Advanced Subacute is protected from civil liability in all situations where they were acting to care for individuals during COVID-19, a public health emergency, unless some exception applies."

Judge Morgan examined precedent defining gross negligence as "a person's conduct where an act or failure to act creates an unreasonable risk of

harm to another because of that person's failure to exercise slight care or diligence." (quoting <u>Steinberg v. Sahara Sam's Oasis, LLC</u>, 226 N.J. 344, 364 (2016)). The judge observed <u>Steinberg</u> "held gross negligence occurs by 'failing to exercise even scant care,' or 'showing indifference to another and an utter disregard of prudence that amounts to complete neglect of the safety of such other person.'" (quoting <u>Steinberg</u>, 226 N.J. at 365). The judge continued: "[G]ross negligence falls on a continuum between ordinary negligence and recklessness, a continuum that extends onward to intentional conduct." (quoting <u>Steinberg</u>, 226 N.J. at 363).

Judge Morgan rejected each ground on which plaintiffs claimed Advanced Subacute engaged in conduct constituting an exception from immunity. First, the judge concluded "no reasonable jury could possibly find that [d]efendant Advanced Subacute's actions in delaying the proper fit testing elevated to the level of gross negligence." The judge explained:

> Advanced Subacute had an obligation to ensure the masks properly fit its employees. The fit testings were [not] timely performed on those employees that had regular conduct with possibly infected patients, such as the housekeeping staff. Defendant Advanced Subacute did ultimately perform the fit testing and it was determined that all facial coverings properly fit. This is not a situation where [d]efendant Advanced Subacute completely ignored the face covering requirement, allowing all its employees to freely roam the facilities

11

with no protection whatsoever. They did require face masks and took steps to mostly seclude its workers if possible. While the delay to fit test may be grounds for simple negligence, it cannot rise to the level of "scant care" or an utter disregard for safety.

Second, Judge Morgan concluded no reasonable jury could find Advanced Subacute's acts with respect to the facility's infection preventionist fell outside the immunity protection. Although Advanced Subacute was required to have an infection preventionist from at least April 2020, it did not retain one until October 2020. The infection preventionist hired by Advanced Subacute visited the facility only twice in 2020, and at her deposition was unfamiliar with the duties of a laundry aide. However, the expert was familiar with the facility's various departments and instituted a prevention plan.

The judge concluded no reasonable jury could find these facts amounted to gross negligence. Judge Morgan noted Advanced Subacute's infection preventionist was hired two months prior to Doto's infection with COVID-19. In addition, the judge observed the preventionist's lack of familiarity with Doto's job duties did not undermine the safety protocols Advanced Subacute put in place for its employees, including Doto.

Lastly, the judge concluded no reasonable jury could find Advanced Subacute was not entitled to immunity for not considering Doto to be a high-

risk employee and preventing him from coming into contact with high-risk employees or linens from the rooms of residents with COVID-19. Judge Morgan noted Doto's exposure to high-risk employees was limited to a single coworker and periodic meetings, where precautions were taken to prevent the transmission of COVID-19. The coworker never tested positive for COVID-19. In addition, linens from the rooms of infected residents were visibly marked to ensure they were handled carefully by Doto and were delivered to him by dumbwaiter. Doto did not deliver clean linens to any residents, which kept him from entering the rooms of residents infected with COVID-19. The judge concluded these facts, which establish attempts by Advanced Subacute to protect Doto, could not support a finding of gross negligence or utter disregard for Doto's health and safety. The judge found, therefore, Advanced Subacute was immune from all claims asserted by plaintiffs.[2]

Although Advanced Subacute's COVID-19 immunity precludes plaintiffs' claims, for the sake of completeness, Judge Morgan also addressed Advanced Subacute's other defenses. The judge discussed the long-established statutory scheme embodied in the WCA in which a worker receives automatic entitlement

---

[2] The court found plaintiffs did not address the actions of any defendant other than Advanced Subacute, warranting dismissal with prejudice of the claims against all defendants.

A-2559-24

to benefits for a work-related injury in exchange for relinquishing their right to pursue common-law remedies against the employer. See N.J.S.A. 34:15-8. The judge concluded N.J.S.A. 34:8-72(b), expressly applies the Act, including the bar against common-law remedies, to leased employees as against both the leasing company and the leasing company's client.

Judge Morgan found the contract between BP and Advanced Subacute unequivocally states it is an employee leasing agreement. The fact Doto remained an employee of BP while leased to Advanced Subacute, the judge found, does not negate the fact that he is also an employee of Advanced Subacute.

The judge also concluded no reasonable jury could find the "intentional wrong" exception to the workers' compensation bar applies here. Judge Morgan rejected the possibility a reasonable jury could conclude the OSHA violations established Advanced Subacute knew its actions were substantially certain to result in injury or death to Doto. The OSHA violations concerned a failure to fit test housekeeping employees for N-95 masks. Doto was not a member of the housekeeping staff and worked in the basement where he, while wearing a surgical mask, only occasionally came into contact with housekeeping staff, who were wearing N-95 masks that had not been fit tested, but which later were

14

demonstrated to fit properly. At best, Advanced Subacute's acts were negligent. Moreover, no jury could find Advanced Subacute's failure to fit test housekeeping staff was intentional, given the vigorous testing and precautions at the facility.

Turning to plaintiffs' three expert reports, the judge began his analysis by stating his agreement with the parties that the claims alleged against defendants required expert evidence because plaintiffs' theory of liability was beyond the ken of the average juror. Plaintiffs offered the reports of three experts: an industrial hygiene specialist, a business consultant who specializes in organizational enhancements, operational improvements and business development, and an infectious disease physician. The judge found each expert offered an inadmissible net opinion with respect to causation.

The industrial hygiene specialist examined Advanced Subacute's protocols to determine whether they satisfied industry norms. Judge Morgan found while the expert's opinion may tend to show Advanced Subacute's practices did not meet industry norms during the COVID-19 pandemic, the expert "failed to discuss . . . Doto at all and does not explain how . . . Doto was impacted" by Advanced Subacute's deviations. The judge concluded the expert

"does not provide the link that shows how falling below these industry norms caused . . . Doto's death."

The judge found the business consultant reviewed Advanced Subacute's business plan to determine whether the facility staff was adequately prepared and trained in handling the fallout from COVID-19. The expert offered the opinion Advanced Subacute failed to follow some expected protocols, including: (1) timely hiring an infection preventionist; (2) failure to fit test all employees; (3) ensuring all staff wore masks at all times; (4) holding employee meetings via Zoom or individually; and (5) instituting laboratory testing to identify and track COVID-19 immediately at the onset of the pandemic. The judge found, however, the expert failed to opine how these shortcomings caused Doto's death. The only explanation provided by the expert is that the COVID-19 pandemic "impacted the life of . . . Doto."

Finally, Judge Morgan found the infectious disease physician opined extensively on the role of the infection preventionist to opine Advanced Subacute failed to ensure the role was adequately used at the facility. The judge found the expert merely states Advanced Subacute's "failures and willful disregard for people's safety exposed . . . Doto to COVID-19" with no further explanation. Judge Morgan concluded the expert provided no facts to support

16

"this generalized opinion" and did not explain how Doto contracted COVID-19 at work. The judge found without an admissible expert opinion on causation, plaintiffs could not prove any of their claims against Advanced Subacute.

A February 28, 2025 order memorialized the court's decision.[3]

Plaintiffs subsequently moved for reconsideration of the February 28, 2025 motion. In support of their motion, plaintiff submitted only a lengthy certification listing the facts they believe the judge overlooked when reaching his decision. Defendants opposed the motion, arguing the judge considered all of the facts in the certification.

On April 16, 2025, Judge Morgan issued a detailed written decision denying plaintiffs' motion. The judge found:

> In the present motion for reconsideration, [p]laintiff[s] typed out [sixty-eight] paragraphs of fact and argument [p]laintiff[s] believe[] this court did not consider and did not appreciate. A review of these facts alongside the court's opinion shows this is not the case. The court did consider these facts, as shown in the following section which provides pin cites in the original Order and Opinion that describe where the fact was discussed and how the court used that fact in its analysis.

---

[3] In addition to dismissing with prejudice the claims against the defendants who moved for summary judgment, the February 28, 2025 order dismissed with prejudice the claims alleged against other defendants the court had previously dismissed from the matter without prejudice. Those other defendants were not named in the third amended complaint.

> In short, this court finds [p]laintiff[s'] argument is merely pointing out facts again to the court [they] believe[] support [their] case.

The judge then provided a more than fourteen-page recitation of how he considered in his first opinion each of the facts on which plaintiffs relied in their motion for reconsideration. An April 16, 2025 order memorialized the court's decision. This appeal followed.

Plaintiffs reiterate their arguments, contending the motion court erred when it failed to appreciate Advanced Subacute's gross misconduct, incorrectly concluded Doto was an employee of Advanced Subacute, and determined the opinions of their experts contained inadmissible hearsay.

## II.

We review a grant of summary judgment de novo, applying the same standard as the motion court. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). That standard requires us to "determine whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)). "Summary judgment should be granted . . . 'against a party who fails to make a

18

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  We do not defer to the motion court's legal analysis or statutory interpretation.  RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018); Perez v. Zagami, LLC, 218 N.J. 202, 209 (2014).

"Competent opposition requires 'competent evidential material' beyond mere 'speculation' and 'fanciful arguments.'"  Hoffman v. Asseenontv.Com, Inc., 404 N.J. Super. 415, 426 (App. Div. 2009) (quoting Merchs. Express Money Order Co. v. Sun Nat'l Bank, 374 N.J. Super. 556, 563 (App. Div. 2005)).  We review the record "based on our consideration of the evidence in the light most favorable to the parties opposing summary judgment."  Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995).

Having reviewed plaintiffs' arguments in light of the record and applicable legal principles, we affirm the orders appealed substantially for reasons stated by Judge Morgan in his thorough and well-reasoned written decisions.  We add the following brief comments.

19

## A. COVID-19 Immunity

The Governor and Legislature intended to grant broad immunity to healthcare facilities treating patients during the COVID-19 state of emergency. Our review of the record leaves us with no doubt Advanced Subacute instituted significant measures to protect its employees and residents from COVID-19 infection. While there may have been some shortcomings in Advanced Subacute's policies during the challenging and uncertain early months of the COVID-19 pandemic, the record demonstrates no reasonable jury could conclude defendants acted in a grossly negligent or more culpable manner with respect to Doto. There was, of course, some risk of infection associated with Doto's position in the laundry department. While that risk could not be completely eliminated, Advanced Subacute acted in a manner consistent with the legislative grant of immunity. On this basis alone, dismissal of plaintiffs' claims with prejudice was warranted.

## B. Worker's Compensation Bar

The WCA compensates employees for personal injuries caused "by accidents arising out of and in the course of employment . . . ." N.J.S.A. 34:15-7. The Act "provide[s] a method of compensation for the injury or death of an employee, irrespective of the fault of the employer or contributory negligence

and assumption of risk of the employee." Harris v. Branin Transp., Inc., 312 N.J. Super. 38, 46 (App. Div. 1998). Recovery under the statute is "the exclusive remedy for an employee who sustains an injury in an accident that arises out of and in the course of employment." McDaniel v. Lee, 419 N.J. Super. 482, 490 (App. Div. 2011) (quoting Ahammed v. Logandro, 394 N.J. Super. 179, 190 (App. Div. 2007)).

The WCA "accomplished a 'historic trade-off whereby employees relinquished their right to pursue common-law remedies in exchange for automatic entitlement to certain, but reduced, benefits whenever they suffered injuries by accident arising out of and in the course of employment.'" Van Dunk v. Reckson Assocs. Realty Corp., 210 N.J. 449, 458-59 (2012) (quoting Millison v. E.I. du Pont de Nemours & Co., 101 N.J. 161, 174 (1985)).

N.J.S.A. 34:8-72(b) provides the "exclusivity of the remedy under the workers' compensation law for personal injuries . . . shall apply to the employee leasing company and the client company."

There is one statutory exception to the recovery bar:

> [i]f an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, except for intentional wrong.

[N.J.S.A. 34:15-8 (emphasis added).]

"In order to satisfy the statutory definition of 'intentional wrong,' the employee is required to show 'deliberate intention' to injure." Mabee v. Borden, Inc., 316 N.J. Super. 218, 227 (App. Div. 1998) (quoting Bryan v. Jeffers, 103 N.J. Super. 522, 524 (App. Div. 1968)). See also Laidlow v. Hariton Mach. Co., 170 N.J. 602, 617 (2002) (holding that an intentional wrong is established where: (1) the employer knew "that [its] actions [were] substantially certain to result in injury or death to the employee, and (2) the resulting injury and the circumstances of its infliction on the worker must be (a) more than a fact of life of industrial employment and (b) plainly beyond anything the Legislature intended the [WCA] to immunize").

There is no doubt Doto was an employee of both BP and Advanced Subacute. Plaintiffs' special employee argument is inapposite. In addition, nothing in the record suggests Advanced Subacute acted in a manner supporting an exception to the WCA bar. At worst, Advanced Subacute inadvertently failed to follow some precautions during an unpredictable healthcare crisis of unusually challenging proportions.

22

C.    Net Opinions

We find no basis on which to disturb the judge's determination plaintiffs' experts offered inadmissible net opinions.  The doctrine barring the admission at trial of net opinions is a "corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data."  Townsend v. Pierre, 221 N.J. 36, 53-54 (2015) (alterations in original) (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)).  The net opinion doctrine requires experts to "give the why and wherefore" supporting their opinions, "rather than . . . mere conclusion[s]."  Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)).

Experts must "be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable."  Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)).  An expert's conclusion should be excluded "if it is based merely on unfounded speculation and unquantified possibilities."  Ibid. (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)).

Bearing in mind "the weight that a jury may accord to expert testimony, a trial court must ensure that an expert is not permitted to express speculative

23                                                                                  A-2559-24

opinions or personal views that are unfounded in the record." Ibid.; see also

Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 401 (2014) ("[T]he standard

of care [the expert] set forth represented only his personal view and was not

founded upon any objective support. His opinion as to the applicable standard

of care thus constituted an inadmissible net opinion."); Pomerantz Paper Corp.

v. New Cmty. Corp., 207 N.J. 344, 373 (2011) ("[I]f an expert cannot offer

objective support for his or her opinions, but testifies only to a view about a

standard that is 'personal,' it fails because it is a mere net opinion.").

Plaintiffs' experts do not identify the basis for their opinions Advanced

Subacute's acts caused Doto to become infected with COVID-19. Doto resided

in the community, where COVID-19 was present and spreading in December

2020. No expert identified with certainty proof Doto became infected with the

virus while at the Advanced Subacute facility, or that any shortcoming by

Advanced Subacute resulted in his infection. No amount of safety precautions

could eliminate completely Doto's risk of infection.

D.    Reconsideration.

Rule 4:49-2 provides:

> Except as otherwise provided by R. 1:13-1 (clerical
> errors), a motion for rehearing or reconsideration
> seeking to alter or amend a judgment or final order shall
> . . . state with specificity the basis on which it is made,

including a statement of the matters or controlling decisions that counsel believes the court has overlooked or as to which it has erred, and shall have annexed thereto a copy of the judgment or final order sought to be reconsidered and a copy of the court's corresponding written opinion, if any.

"A motion for reconsideration . . . is a matter left to the trial court's sound discretion." Lee v. Brown, 232 N.J. 114, 126 (2018) (alteration in original) (quoting Guido v. Duane Morris LLP, 202 N.J. 79, 87 (2010)); see also Cummings v. Bahr, 295 N.J. Super. 374, 389 (App. Div. 1996). A party may move for reconsideration of a court's decision pursuant to Rule 4:49-2 on the grounds that (1) the court based its decision on "a palpably incorrect or irrational basis," (2) the court either failed to consider or "appreciate the significance of probative, competent evidence," or (3) the moving party is presenting "new or additional information . . . which it could not have provided on the first application." Id. at 384 (quoting D'Atria v. D'Atria, 242 N.J. Super. 392, 401-02 (Ch. Div. 1990)).

The moving party must "initially demonstrate that the [c]ourt acted in an arbitrary, capricious, or unreasonable manner, before the [c]ourt should engage in the actual reconsideration process." D'Atria, 242 N.J. Super. at 401. A motion for reconsideration is not an opportunity to "expand the record and reargue a motion. . . . [It] is designed to seek review of an order based on the

A-2559-24

evidence before the court on the initial motion, . . . not to serve as a vehicle to introduce new evidence in order to cure an inadequacy in the motion record." Cap. Fin. Co. of Del. Valley, Inc. v. Asterbadi, 398 N.J. Super. 299, 310 (App. Div. 2008).

Judge Morgan issued a detailed opinion refuting each of plaintiffs' claims he overlooked a crucial fact when he granted defendants' motion for summary judgment. Reconsideration was not warranted.

To the extent we have not specifically addressed any of plaintiffs' remaining claims, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Hanley*

Clerk of the Appellate Division

A-2559-24